UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-20716-CR-LENARD/TURNOFF

**UNITED STATES OF AMERICA**,

        Plaintiff,

vs.

**IRIS HAYDEE VICTORES,
CARLOS ALBERTO ORTEGA and
CARLOS A. ORTEGA, JR.,**

        Defendants.
_____/

**<u>ORDER ADOPTING REPORT AND RECOMMENDATION (D.E. 70)
AND DENYING DEFENDANTS' JOINT MOTION TO SUPPRESS EVIDENCE
(D.E. 34, 36) AND DEFENDANT CARLOS A. ORTEGA JR.'S MOTION TO
SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS (D.E. 38)</u>**

**THIS CAUSE** is before the Court on the Report and Recommendation of U.S. Magistrate Judge William C. Turnoff ("Report," D.E. 70), issued on February 10, 2011. In his Report, Magistrate Judge Turnoff recommends that Defendants' Joint Motion to Suppress (D.E. 34, 36) and Defendant Carlos A. Ortega, Jr.'s Motion to Suppress Physical Evidence and Statements (D.E. 38), all filed on November 2, 2010, be denied. (Report at 15-16.) On February 24, 2011, Defendants Iris Haydee Victores and Carlos Alberto Ortega filed their Joint Objections to the Report (D.E. 75 and 76) and Defendant Carlos Ortega, Jr. filed his Objections (D.E. 74) as well. The Government filed its Response ("Response," D.E. 77) to all Objections on March 9, 2011. After a *de novo* review of the Report, Objections, Response and the record, the Court finds Defendants' respective motions to suppress should be denied for the following reasons.

I.      **Factual and Procedural Background**

On September 8, 2010, Drug Enforcement Administration agents approached the home of Defendants Iris Haydee Victores and Carlos Alberto Ortega, located at 2951 S.W. 139th Avenue in Miami (the "parents' residence"), to conduct a "knock and talk." Defendant Victores subsequently executed a written consent to search form which allowed the agents to search the premises. A search revealed a hydroponic marijuana laboratory, harvested and packaged marijuana and equipment commonly used in hypdroponic marijuana grows.

While the search of the parents' residence was ongoing, DEA agents approached the residence of Defendant Ortega Jr., located at 9921 West Calusa Club Drive in Miami ("son's residence"). There, the agents obtained written consent to search the residence from both Ortega Jr. and his wife, Yanelys Rodriguez. A search of the son's residence turned up, *inter alia*, two firearms, packaged marijuana, seven large jugs of hydroponic fertilizer and a bag of soil containing a marijuana root system. All three defendants were placed under arrest and charged with conspiracy to possess with intent to distribute marijuana, two counts of possession with intent to distribute marijuana, and maintaining a marijuana grow house.

On November 2, 2010, Defendants' filed their respective motions to suppress the evidence discovered at the parents' residence and the son's residence. (*See* D.E. 34, 36 and 38.)  On November 29, 2010, Magistrate Judge Turnoff conducted an evidentiary

2

hearing on the instant motions to suppress.[1]

## II. The Report, Defendants' Objections and the Government's Response

Magistrate Judge Turnoff issued his Report on February 10, 2011, recommending that each of the Defendant's Motions to Suppress be denied. Specifically, the Report finds that the investigating agents had reasonable suspicion to conduct a "knock and talk" at the parents' residence, that the agents' entry onto the curtilage of the parents' residence was improper in light of the Fourth Amendment, however Defendant Victores' subsequent consent to search her and Defendant Ortega's residence was voluntary and not the result of the agents' illegal entry, the agents' entry onto Defendant Ortega Jr.'s residence was proper and not in violation of the Fourth Amendment, and Defendant Ortega Jr.'s consent to the search of his residence was freely and voluntarily given, and therefore valid.

In their Joint Objections, Defendants note that on September 8, 2010, the agents made uninvited entry on their gated curtilage, through their side door before any consent was given and conducted a protective sweep through the front door before Victores could give consent for a search. (Objections at 4-5.) They argue that agents violated their Fourth Amendment rights by these warrantless trespasses, such that any later consent provided by Victores was involuntary due to coercive law enforcement conduct. (*Id*. at 7-8.) As a result, the government has not proven and cannot prove by clear and convincing

---

[1] Transcripts of the November 29, 2010 evidentiary hearing can be found at D.E. 54 (Morning Session) and D.E. 66 (Afternoon Session). They will be cited as "Morning Tr. ##:##" and "Afternoon Tr. ##:##."

evidence that her alleged consent was freely and voluntarily given. (*Id.*)[2] For these reasons, Defendants argue that the Report erred in recommending denial of their motion to suppress all evidence found at the parents' residence. (*Id.* at 11.)

Defendant Ortega Jr. also objects, claiming that the Report erroneously finds that he gave consent to the search of his home and the agent who allegedly secured this consent did not act reasonably. (Ortega Jr. Objections at 5.) Ortega Jr. cites the testimony of Agent Kimako Finey, who advised agents that Ortega Jr. would meet the agents at his residence and cooperate, despite Finey having no knowledge of the phone call made to Ortega Jr. which purportedly gained his assent. (*Id.* at 3-4 (citation to transcript omitted.) Because Agent Finey acted "recklessly" in disseminating information, a chain of events was set in motion during which Ortega Jr. was surprised at his home by law enforcement and his subsequent consent was also involuntary and coerced. Therefore, the Report's recommendation as to Ortega Jr.'s motion to suppress the evidence found at his residence should be overruled. (*Id.* at 1-2.)

## III.   Discussion

### A.   The Parents' Residence

*1.   Knock and Talk*

In their Motion to Suppress, Defendants Victores and Ortega argued that the agents lacked reasonable suspicion to conduct a "knock and talk" at the parents' residence

---

[2] Defendants point out that Victores knew the agents would find incriminating evidence in her home and therefore would never consent unless she was coerced or felt she had no alternative. (Objections at 10-11.)

on September 8, 2010. They claim that the information provided by a first time confidential informant did not, as a matter of law, create the reasonable suspicion to conduct the "knock and talk."

In his Report, the Magistrate Judge found that the tip from the informant, that marijuana had been observed in various stages of growth in the parents' residence, along with the agents' observations during surveillance of the home provided them with reasonable suspicion to support their decision to do a "knock and talk." (Report at 8, citing *U.S. v. Tobin*, 923 F.2d 1506, 1508 (11th Cir. 1991) (*en banc*) and *United States v. Smith*, 2010 WL 3835229, at *16 (S.D. Fla. Sept. 17, 2010).)

Defendants do not object to the Report's finding and the Court concurs with the Magistrate, concluding that the agents' bases for conducting a "knock and talk" at the parents' residence were supported by reasonable suspicion.

*2.     Entry Upon Curtilage of Parents' Residence*

The Fourth Amendment's protection against warrantless entry and search extends to curtilage outside of the home. *Oliver v. United States*, 466 U.S. 170, 180 (1984). Curtilage is the area outside the home that "harbors those intimate activities associated with domestic life and the privacies of home." *United States v. Dunn*, 480 U.S. 294, 300 (1987)[3]. The boundaries of curtilage are not necessarily defined by a fence or property line. *Id.* at 301. Instead, the curtilage, in essence the area that a person reasonably may

---

[3]     In contrast to "open fields" which include undeveloped or unoccupied areas outside the curtilage. *Dunn*, 480 U.S. at 304.

5

expect to be treated as an extension of the home, are determined by four factors: "(1) the proximity of the area to the home, (2) whether the area is within an enclosure surrounding the home, (3) use of the area, and (4) steps taken to protect the area from observation by the public." *Id.*

Here, the parents' residence is surrounded by concrete wall with bars on top, a total height of six to seven feet. (*See* Ex. 1 to Resp. To Mot. To Suppress, D.E. 51-1.) The driveway is protected by an electronic gate which is opened from inside the house by the homeowner. The area inside the gate is marked and identifiable. *See United States v. Hambleton*, 2009 U.S. Dist. LEXIS 25139, at *10 (N.D. Fla. Mar. 18, 2009) Despite the absence of any signs and the ability to see through the iron bars into their driveway and front yard, all evidence points to the Defendants' intent to exclude unannounced visitors from their property. *See Edens v. Kennedy*, 112 Fed. Appx. 870, 875 (4th Cir. 2004); *see United States v. Seidel*, 794 F. Supp. 1098 (S.D. Fla. 1992); *Hambleton*, 2009 U.S. Dist. LEXIS 25139, at *10. In order to gain entry onto the property, law enforcement agents would have had to identify themselves, just as any civilian visitor. *Cf. United States v. Lowry*, 315 Fed. Appx. 214, 215 (11th Cir. 2008) ("an officer is permitted to approach a residence and knock on the front door of any property to the extent that a private citizen could do the same"). Upon consideration of the four factors listed in *Dunn*, the Court agrees with the finding of the Report – the area inside Defendants' gate is properly designated curtilage.

Consequently, the agents entry into the curtilage of the parents' residence,

accomplished by following a civilian vehicle for which the gate was opened and without express authorization[4], was in violation of the Fourth Amendment.

The government's objections to this finding are unpersuasive. In any event, parsing caselaw to determine Defendants' objective intent to exclude unintended visitors would be to no avail as the agents advanced up the driveway to the area immediately outside of the home's front and side doors – well within this Court's narrowest definition of curtilage. *See Hambleton*, 2009 U.S. Dist. LEXIS 25139, at *9.

### 3. Defendant Victores' Consent to Search

Improper entry onto curtilage does not automatically require suppression of evidence. The government may avoid suppression of evidence if it can show that the defendant's subsequent consent to search was voluntary and "sufficiently an act of free will to purge the primary taint of the unlawful invasion, or, alternatively, that the causal connection had become so attenuated as to dissipate the taint." *United States v. Delancy*, 502 F.3d 1297, 1309 (11th Cir. 2007) (internal quotes and citations omitted); *see Hambleton*, 2009 U.S. Dist. LEXIS 25139, at **12-13. To make this determination, courts engage in a two-step inquiry: (1) whether defendant's consent was voluntary and (2) whether defendant's consent resulted from the illegal intrusion. *Delancy*, 502 F.3d at 1308; *Hambleton*, 2009 U.S. Dist. LEXIS 25139, at *13.

The government bears the burden of showing that defendant's consent to search

---

[4] Per the testimony of Agent Steven Temprano. (*See* Morning Tr. 92:11-19.) The agents' car apparently entered the driveway as the gate was closing; its passenger side mirror hit the gate and popped out. (*Id*. 92:20-23.)

was voluntary.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  For consent to be voluntary, "it must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  Viewing the question of voluntariness in light of the totality of circumstances, some factors relevant to the discussion include "the presence of coercive police procedures, the extent of the [defendant's] cooperation with the officer, the [defendant's] awareness of [their] right to refuse consent, the [defendant's] education and intelligence, and the [defendant's] belief that no incriminating evidence will be found."  *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001); *see United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002) (also considering whether defendant was free to leave).  Consideration of these factors leads this Court to the same finding made in the Report: Defendant Victores' consent to search her residence was voluntary.

Upon arriving at the front door, Agent Temprano called out "policia."[5]  (Morning Tr. 96:10-12.)  Defendant Victores approached the door and allowed Temprano into the hallway area.  (*Id*. 96:18.)  He did not have his gun drawn.  (*Id*. 96:24-97:1.)  Temprano explained to Victores that he and his team were there to investigate an alleged hydroponics laboratory within the residence.  Without prompting, she said something like "they belong to me . . . . [l]et's go get them," and led Temprano to a room behind a blacked out door in which he could smell marijuana.  (*Id*. 98:16-20.)  Temprano then

---

[5] Temprano did not recall whether the front door of the parents' residence was ajar and he pushed it open or whether it was already wide open.  (Morning Tr. 96:13-16.)

asked her to return to the kitchen and provide consent for the search. (*Id*.)

Once back in the kitchen, Victores read over the consent form, in Spanish, and signed it. (*Id*. 99:15-17; 99:25-100:3.) At time of signing, none of the agents had seized any evidence, attempted to open any locked doors or compartments, handcuffed anyone or pointed a gun at anyone. After the consent form was signed, Victores provided the agents with keys. The agents then discovered marijuana in two bedrooms, one of them locked, and a hydroponic laboratory in a locked structure in the backyard.

The Court finds that Victores was not coerced by the agents, was aware of her right to refuse consent and was informed of her rights by the agents as well as by the consent form, which was in Spanish. Victores' question to Agent Temprano regarding a warrant to search evidenced an awareness of her rights and the ability to intelligently consider her options. Although she had the belief that incriminating evidence would be found, as shown by her vague admissions to Agent Temprano, she knowingly consented to the search. For these reasons, the Court concludes that Victores' consent to search the parents' residence was voluntary. *See Ramirez-Chilel*, 289 F.3d at 752.

Next the Court must determine whether Victores' consent, provided after the agents' entry upon her curtilage and through the side door of her home, was not tainted by these illegal activities. *See Delancy*, 502 F.3d at 1308. The Court considers three factors in this analysis: "the temporal proximity of the . . . [illegal conduct] and the consent, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 1309.

9

Here, Victores' verbal consent followed the agents' arrival at her front door by a few minutes. (Morning Tr. 125:17-19.) She executed written consent approximately ten minutes after their arrival. (*Id.* 125:20-23) Such a short period of time weighs in favor of exclusion, but it is not the single determinative factor. *See Delancy*, 502 F.3d at 1311; *Smith*, 2010 WL 3835229, at *23 (impact of short temporal proximity between illegal activity and consent softened by polite and non-threatening conduct of officers).

As to the second factor, Victores' review and execution of the written consent form, presented and explained in Spanish, is a sufficient intervening circumstance to alleviate the taint of the agents' illegal entry. *See United States v. Myers*, 335 Fed. App'x 936 (11th Cir. 2009); *Smith*, 2010 WL 3835229, at *22; *United States v. Blackburn*, 398 Fed. Appx. 453, 462 (11th Cir. 2010).

The third factor, the purpose and flagrancy of the official misconduct, requires the Court to inquire whether the illegal police activity was taken with the direct purpose of exploiting the illegal action, the scope of the illegal search and whether law enforcement illegally seized evidence to obtain consent. *Blackburn*, 398 Fed. Appx. at 462; *Delancy* 502 F.3d at 1312-13.

Here, we have three alleged illegal activities, the agents' entrance onto the curtilage of the parents' residence, their entrance through the side door of the home and their protective sweep of the home shortly after entrance. Despite multiple violations, the Court finds that the goals of the agents' activities were lawful. The agents entered onto the curtilage to conduct a "knock and talk." They entered the side door in order to

10

execute a protective sweep for Osvaldo Marrero, and to escort three elderly persons inside the home. The agents that followed Temprano through the front door and did a quick protective sweep, did so for the purpose of safety, checking behind the blacked out door and making sure no danger lurked inside the home. (*See* Afternoon Tr. at 28-30.) The protective sweep was limited only to the areas which might pose safety risks. (*Id*. at 29-30.) No evidence was seized during the sweep and Temprano testified that his team made sure to obtain written consent from Victores prior to searching and seizing anything within the home.

The Court finds that the breadth and purpose of the protective sweeps was legal. *See, e.g., Maryland v. Buie*, 494 U.S. 325, 335 (1990) (holding that a protective sweep is permissible if it is a quick and limited search, conducted for the purpose of safety and narrowly confined to a cursory visual inspection of potential hiding spots). Similarly, the agents' entry onto the curtilage was for the legal purpose of a knock and talk, and not to exploit any evidence they might find in order to coerce the consent of the Defendants. *See Delancy*, 502 F.3d at 1313 (evidence allowed after Eleventh Circuit found that there was no suggestion that police exploited evidence found prior to consent). The circumstances surrounding the agents' entry of the parents' residence, namely their calm interactions with Victores and the absence of drawn weapons or restraints upon anybody inside the home, support this Court's finding that the agents' illegal actions lacked flagrancy.

Upon review of all three factors, the Court concludes that Victores' oral and

11

written consent to the search of her home was not tainted by the preceding illegal actions of law enforcement.  Defendant Victores and Ortega's Motions to Suppress must therefore be denied.

### B.     Ortega Jr.'s Residence

Ortega Jr. objects to the Report's factual findings and legal analysis, arguing that the search conducted at his residence was without probable cause or consent.  The basis of his objection derives from Agent Finey's allegedly mistaken and unsupported belief that Ortega Jr. had provided consent for the agents to meet him at his residence and subsequently search it.

At the hearing on the motions to suppress, Finey testified that while at the parents' residence, he asked his supervisor, Sergeant Fernandez, to have Carlos Alberto Ortega call his son because agents wanted to search the son's residence.  (Morning Tr. 25:19-26:10.)  A call was made to Ortega Jr., but Finey was not privy to its details.  Finey then relayed this information to Temprano, who had already arrived at son's residence.  Finey told Temprano that Ortega Jr. had agreed to meet the agents at his house.  A day or so later, Finey learned that Victores, and not Ortega, had called their son.  Finey's knowledge of Ortega Jr.'s acquiescence over the phone call was entirely secondhand.

As Ortega Jr. arrived at his gated residence sometime around 2 p.m. on September 8, Agent Temprano's vehicle followed him through the gate.  Although he did not recall it, Temprano's vehicle was hit by the closing gate.  Temprano testified that it was his understanding that Ortega Jr. had agreed to meet the agents at his house.  (*Id*. 103:2-9.)

Once inside the gate and out of his vehicle, Temprano explained his presence and purpose, in Spanish, to Ortega Jr. and his wife, Yanelys Rodriguez.  (*Id*. 105:4-19.)  Both Ortega Jr. and Rodriguez signed the consent to search form.  (*See* Consent to Search, Ex. 3 to Response to Mot. to Suppress, D.E. 51-3 (the signed form is in English).)

The Magistrate Judge finds that that Agent Temprano's access to the son's residence was based on a mistaken but reasonable belief that Ortega Jr. had agreed to meet the agents at his residence.  (Report at 14, citing *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990).)  This Court agrees.  Although Agent Finey had no knowledge of who called Ortega Jr. or what was discussed, his relay of information to Temprano was reasonable under the circumstances.  Victores had indeed spoken to her son, and upon his return home, Ortega Jr. was already aware that agents were at his parents' residence.  The factual determinations made by Finey and Temprano may not have been entirely correct, but they were reasonable and not reckless.  *See Rodriguez*, 497 U.S. at 185.

Furthermore, Ortega Jr. and his wife's consent to the search of their home was voluntary and not coerced by Temprano and his colleagues.  Ortega Jr. does not object to this finding.[6]

A review of the record shows that none of the agents drew their weapons, the conversation with Ortega Jr. and Rodriguez was calm and cordial, and Ortega Jr. and

---

[6] Ortega Jr.'s Objections only focus on the reasonableness of the agents' actions in light of Finey's misinformation. Failure to timely file objections shall bar parties from attacking on appeal the factual findings contained in the report. *See Resolution Trust Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

13

Rodriguez were informed of their rights in Spanish before signing the written form. The voluntariness of their consent and the circumstances surrounding it were confirmed by the Magistrate Judge's credibility determination of Rodriguez' and Temprano's testimonies. (Report at 13-14, citing *United States v. Pineiro*, 389 F.3d 1359, 1366 (11th Cir. 2004) (credibility determinations are within the province of the fact finder).)

Defendant Ortega's Objections to the Report are therefore unpersuasive and must be denied.

Accordingly, after an independent review of the Report, Objections, Response and record, it is hereby **ORDERED AND ADJUDGED** that:

1. The Report and Recommendations of the Magistrate Judge (D.E. 70), issued on February 10, 2011, is **ADOPTED**.

2. Defendants' Joint Motion to Suppress Evidence (D.E. 34 and 36), filed on November 2, 2011, is **DENIED**.

3. Defendant Carlos A. Ortega, Jr.'s Motion to Suppress Physical Evidence and Statements (D.E. 38), filed on November 2, 2011, is **DENIED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 5th day of August, 2011.

                                                     **JOAN A. LENARD**
                                               **UNITED STATES DISTRICT JUDGE**